UNITED STATES of America, Plaintiff,

v.

PHILATELIC LEASING, LTD., Melvin Hersch, Hambrose Stamps, Ltd. and Global International, Ltd., Defendants.

No. 83 Civ. 4432 (WK).

United States District Court, S.D. New York.

Feb. 13, 1985.

William J. Brennan, Asst. U.S. Atty., New York City (Rudolph Giuliani, U.S. Atty., S.D.N.Y. and Gerald Ford, Asst. U.S. Atty., New York City, of counsel), for plaintiff.

Jules Ritholz, New York City (Kostelanetz & Ritholz and Elliot Silverman, New York City; Doros & Blessey, P.C. and Robert L. Blessey, New York City, of counsel), for defendants Philatelic Leasing, Ltd. and Melvin Hersch.

Alan Levine, New York City (Kronish, Lieb, Shainswit, Weiner & Hellman and Joann B. Blasberg, New York City, of counsel), for defendant Hambrose Stamps Ltd.

Saltzman, Garbis & Schwait, New York City, for Global International, Ltd., amicus curiae.

MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

### INTRODUCTION

We are advised that this case represents the Government's first attempt—at least in this District—to use Sections 6700 and 7408 of the Internal Revenue Code to stamp out a peculiar type of tax fraud. Section 6700 defines an offense—entitled "Promoting Abusive Tax Shelters"—which may be enjoined pursuant to Section 7408. In this law suit we are concerned only with tax advantage investment programs ("shelters") which are created by the device of having the provider of the shelter lease supposedly productive assets—here, "stamp masters"—to taxpayers in circumstances where the lessor passes his investment tax credit ("ITC") on to the taxpayer so that the latter can use it in reducing his tax liability. The lessor's ITC (which is passed on to the taxpayer) is based on its own cost in acquiring the asset.

## THE STATUTE

Section 6700 starts off with a rather complicated definition of the "persons" to whom it applies (§ 6700(a)(1)); and proceeds to make it unlawful for any such person to make certain fraudulent statements in the course of selling a tax shelter (§ 6700(a)(2)(A)), or to make a "gross valuation overstatement as to any material matter" in connection with such sale (§ 6700(a)(2)(B)). The Government has invoked only the second of those prohibitions and, so far as here relevant, a "gross valuation overstatement" is defined (in § 6700(b)(1)) as a statement fixing an asset's value at more than 200 percent of (*i.e.*, more than twice) its actual value. Section 7408 authorizes a court—in appropriate circumstances—to issue an injunction against any person found to have violated Section 6700.

## THE DEFENDANTS

The defendants named in the complaint are: Philatelic Leasing, Ltd. ("Philatelic"), which in 1982 offered "stamp masters" for lease to the public; Hambrose Stamps, Ltd. ("Hambrose"), which had supposedly sold them to Philatelic; Global International, Ltd. ("Global"), which had supposedly sold them to Hambrose, having manufactured them pursuant to a license obtained from Crailheath, Ltd. ("Crailheath"), a British concern not named as a defendant; and Melvin Hersch ("Hersch") who in 1982 was president of Philatelic, having previously served as president of Hambrose. A consent judgment was entered against defendant Global. It accordingly did not participate in the trial, but—as *amicus curiae*—has continued to show an active interest in the proceedings.

## QUESTIONS PRESENTED

It is common ground that all defendants are "persons" within the meaning of Section 6700. The Government, proceeding under subdivision (a)(2)(B) of that Section, contends that the actual value of the "stamp masters" here involved was minimal, and that Philatelic's asserted cost in acquiring them from Hambrose (which asserted cost established the ITC passed on to its taxpayer-lessees) was a great deal more than twice such actual value. The Government claims that this contention has been established by proof that the series of purported transactions between Global, Hambrose and Philatelic constituted a sham specifically designed to conceal the fact that the stamp masters were actually without substantial value. The Government also claims that the same lack of value is established by expert testimony showing that there is no real market for the stamps created by the "masters." Defendants' basic contention, on the other hand, is that Philatelic's asserted cost in acquiring the stamp masters from Hambrose was the product of arms-length bargaining between those two entities; and that Hambrose's own cost was, in turn, established by arms-length bargaining between it and Global. The defendants also dispute the Government's contentions as to the effect of the expert testimony. Defendants further contend that regardless of the value of the stamp masters, injunctive relief would be inappropriate; and defendant Hambrose contends that no case has been established as to it.

## INTRODUCTORY OBSERVATION

We find ourselves in a rather unusual position. The trial in this case consumed eight court days and generated a 1,468 page trial record. In addition, 122 exhibits and 602 pages of deposition testimony have been submitted for our consideration. Yet the testimony of just three witnesses—Clive Feigenbaum, the president and owner of Crailheath; Herman Finesod, the owner of Hambrose; and the defendant Melvin Hersch—has persuaded us that the entire "stamp master" scheme constituted a simple conspiracy by those men, and others mentioned in the evidence, to perpetrate a tax fraud; that the various corporate entities which are parties to this law suit and otherwise mentioned in the evidence were mere instruments in that conspiracy; and that the testimony of these three men was deliberately designed to conceal the existence of this conspiracy. For reasons which we shall elaborate, we further conclude

that this conspiracy to conceal the truth—initiated in 1979 and continuing to the present day—justifies a finding that the "stamp masters" were indeed without substantial value.

### THE BACKGROUND AGAINST WHICH THE TESTIMONY OF FEIGENBAUM, FINESOD AND HERSCH SHOULD BE CONSIDERED

By way of definition, a "stamp master" is a photographic color separation used for producing postage and similar stamps.

The allegedly abusive shelters with which we are here concerned were made available to the public through a program run in 1982 by defendant Philatelic, in which Philatelic leased to taxpayers certain stamp masters pursuant to contracts authorizing them to produce defined numbers of stamps over a seven-year period. Philatelic purported to have purchased these stamp masters from Hambrose which, in turn, purported to have purchased them from Global.

The stamps produced by the masters here in question are local carriage labels or stamps for the islands of Staffa, Bernera, Eynhallow and Grunay. Of these islands—all of which are located off the coast of Scotland—two are sparsely inhabited, while two are completely uninhabited but receive tourist trade. Staffa, in particular, is popular with tourists for its natural wonders, including Fingal's Cave which inspired—among other works of art—Mendelssohn's *Hebrides Overture*. The stamps here involved may be used for the carriage of mail (posted either by tourists or by inhabitants of the islands) between points on the islands, or to the British post office on the Isle of Mull, where additional British postage must be affixed if the mail is to travel further. The stamps bear images which can be categorized by "topic"—birds, flowers, sporting events, etc.

A right to issue stamps was originally granted by the British Crown to the Laird of the mentioned Islands. Prior to 1979 the Laird had assigned that right to various persons in no way concerned with any of the events here at issue. In that year he revoked all previous assignments and then, through a series of agreements, assigned the right to two related British corporations, one of which, Crailheath, authorized Global to issue stamps under terms and conditions which seem relevant to this law suit only to the extent that the Crailheath-Global contracts did not preclude Crailheath from granting similar licenses to competitors of Global (*see* Exhibits 241–244).

So far as the record indicates, stamps—as opposed to stamp masters—issued in the names of these Islands first appeared as collectors' items back in 1974 (prior to Crailheath's coming into the picture) when Staffa stamps printed on gold foil were offered to collectors both in the United States and abroad. These gold foil stamps seem to have been highly successful and to have achieved total retail sales of twenty-six and a half million dollars. Although each stamp contained only a few cents worth of gold, their prices tended to vary with the world price of gold, the highest price they achieved in the United States appearing to be about $20 a stamp.

The use of stamp masters as tax shelter instruments first surfaced in 1979.[1] In that year Herman Finesod (not a party to this lawsuit) organized defendant Hambrose which—we are told—purchased from defendant Global seventeen stamp masters, each of which entitled the purchaser to print 75,000 sets of stamps. Hambrose sold these stamp masters to a stamp company not a party to this lawsuit, which in turn sold them to seventeen different purchasers. The record does not disclose the prices at which these transactions occurred. In the following year Hambrose, acting through its then president, defendant Hersch, is said to have purchased from Global fourteen stamp masters and to have sold them directly to the public. In 1981 it

---

1. So far as the record in this case indicates, the idea of using stamp masters for tax shelter purposes originated with these defendants, and no one had ever previously tried to sell a stamp master for that or any other purpose. *See* correspondence attached to the Court's Order of October 15, 1984; *see also* Tr. 616.

sold to the public 253 stamp masters said to have been so purchased. These 1979, 1980 and 1981 transactions (referred to in the testimony as the 1979, 1980 and 1981 programs) are not here in issue, the statute under which the Government proceeds not having been enacted until September 3, 1982. The record, accordingly, does not disclose many details of these transactions, except that they were based on the sale (rather than lease) of stamp masters to taxpayers, which would make the purchasers' claimed tax advantage depend on their own claimed purchase price rather than upon a claimed investment credit related to their lessor's claimed acquisition cost. However, it does seem to appear that no purchaser of a stamp master from Hambrose in these years has as yet been able to show a profit on his investment.

The facts relative to Philatelic's 1982 program are set forth (mostly by stipulation) in more detail. Crailheath, for an insignificant sum, acquired from the Laird the exclusive right to issue stamps in the names of these islands and, at a price of about $3.60 each, gave Global the non-exclusive right to manufacture and sell up to 10,000 stamp masters. Global was able to manufacture these masters at an unspecified but inconsequential cost. It purported to sell them to Hambrose at prices ranging from $100,000 for a two stamp master to $207,000 for an eight stamp master (a mean price of $153,500). Hambrose immediately (without adding any value) purported to sell them to Philatelic at prices ranging from $150,000 for a two stamp master to $400,000 for an eight stamp master (a mean price of $275,000). No significant transfer of cash was involved in any of these sales, the alleged purchase prices being in the form of non-recourse notes and the transfer of cash being deferred until such time as it was acquired from taxpayers seeking shelter from IRS storms.

The defendants, at trial, sought to rebut the inferences seeming inexorably to flow from the foregoing stark facts by contending that Global, Hambrose and Philatelic were independent entities primarily concerned with their own well being, and that the quoted purchase prices had been arrived at by arms-length negotiation between them. Thus, for example, Point II–C of Philatelic's Pre-Trial Memorandum asserts (at p. 30): "The Arms-Length Purchases of the Stamp Masters Proves They Were Not Grossly Overvalued."

## THE TESTIMONY OF CLIVE FEIGENBAUM

Clive Feigenbaum did not appear at the trial, but the parties submitted his 209-page deposition which had been taken at the office of the United States Attorney on February 2 and 3, 1984. Two lawyers for the defense were involved at that deposition: one represented the witness himself and defendant Global, while the other represented all other defendants, i.e., those now before us.

It may be said at the outset that despite constant intervention of counsel and despite the fact that on the day preceeding the deposition the witness had had three hours of counseling with his own attorney, in which the attorney for the defendants now before us participated for "I guess an hour" (Deposition of Feigenbaum [hereinafter "Feig. Dep."] at 12–13), he exhibited an extraordinarily feeble memory, failing to remember matters as to which one would expect a clear recollection from a person in his purported position. It should also be noted that, in general, Feigenbaum—with the concurrence of the defendants now before us—adopted a policy of silence which had the effect of inhibiting the emergence of evidence having a bearing on the issues being litigated.[2]

**2.** The attorney representing Feigenbaum at the deposition supported his policy of silence by directing him not to answer certain pertinent questions (Feig. Dep. 33 line 11, 53 line 15, 55 line 23, 57 line 16, 60 line 21, 63 line 24, 64 line 15, 65 lines 6–25, 66 lines 2–8, 65 line 5 to 67, 128 line 13, 205 line 21); by making such admo-

nitions as "[i]f you remember, Clive, and there isn't, you know, a penalty for not remembering" (Id., Feig. Dep. 120 line 15, also 110 line 20, 128 line 23, 140 line 8, 146 line 3, 172 line 20); and by intervening in various other ways (Feig. Dep. 33 line 11, 42 lines 13–21, 47 lines 9–11, 58 line 20, 59 lines 11–15, 70 lines 11–14, 104 lines

The substance of Feigenbaum's testimony may be conveniently divided into three categories: his general background in and knowledge of stamp collecting; his description of various of the corporate entities involved in this lawsuit; his purported representation of Global in its alleged negotiations with Hambrose, and his familiarity with the nature and needs of his alleged principal in that negotiation; and, finally, his familiarity with the taxshelter—as opposed to the stamp collecting—business.

Feigenbaum's experience in and knowledge of stamp collecting were impressive. He started dealing in stamps part-time at the age of 16 (25 years before the time of his deposition) and had dealt in stamps continuously ever since (Feig. Dep. 14). In 1961 he formed a stamp company which dealt in Middle Eastern stamps, and in 1964–65 began to specialize in topical stamps such as those commemorating the deaths of Kennedy and Churchill (*Id.* 14–15). By 1967–68 he began to observe a growing collectors' interest in "thematic"—or "topical"—stamps and, because he recognized a "demand for thematics wherever they came from," began specializing in "locals" (*Id.* 15).[3] From that time on he organized, or was associated with, a variety of firms specializing in local stamps (*Id.* 15–20, 51). He was also a member of several philatelic associations (*Id.* 16–17). He identified several catalogues which listed and priced local—especially British local—stamps (*Id.* 71–75), and spoke generally of

an active market in such stamps (*Id.* 77–86).

With respect to some of the entities involved in this law suit, he explained that Crailheath was a British corporation organized and owned by him which, together with another similarly organized and owned British corporation, had in 1979 and thereafter obtained from the Laird the exclusive right to issue stamps in the names of the four Scottish islands here involved. Global, to which Crailheath gave a non-exclusive right to issue certain numbers of such stamps (*Id.* 99) was apparently owned by one Michael Shine. (*Id.* 53, 59.) Although Shine is now a citizen of Israel, he had been born and brought up in England, where his parents had been close friends and neighbors of Feigenbaum's parents (*Id.* 54–55). It was through this familial relationship that the two men were thrown together (*Id.* 51–55). The witness also identified Norfolk Press, Limited, another Michael Shine company, which, pursuant to contracts negotiated by Feigenbaum on its behalf, printed for about $2,000 per stamp master such stamps as the various annual programs required (*Id.* 183–7). He was instructed not to give any information as to when or in what circumstances Global or Norfolk had been founded (*Id.* 53, 63, 64).

Turning to his purported negotiations with Hambrose on Global's behalf, Feigenbaum categorically asserted that he had negotiated the Global-Hambrose contracts in 1979, 1980, 1981 and 1982 (*Id.* 116, 118–19, 157, 165, 166); that, so far as he could

21–23, 113 lines 6–10, 114 line 10, 118 lines 18–20; 134 lines 21–22, 137 lines 16–18, 160 lines 23–25, 189 lines 22–25, 190 lines 2–11). Our finding that the defendants now before us concurred in Feigenbaum's policy of silence is based on two considerations: *first*, the attorney then representing them participated in preparing Feigenbaum for the deposition, and took no steps to counter the tactics employed during its course; and *second*—much more importantly—each of such defendants had a vital interest in developing any favorable testimony Feigenbaum might have been able to offer. This second consideration becomes the more compelling in light of the fact that the bulk of Feigenbaum's testimony was completed in the first day of his two-day examination. All defendants thus had ample opportunity to consider whether their

own best interests would be furthered by the exercise of their right to cross-examine Feigenbaum, or whether the better strategy was to let him return to England after a few perfunctory questions.

3. The words "thematic" and "topical" are synonymous. They refer to stamps that are identified with a theme or topic such as an historical event, a particular sport, or a particular form of wildlife. "Local" stamps are those—like the ones here involved—which are not recognized by the Universal Postal Union, but are good for the carriage of mail from point to point within a limited geographical area. Like the ones here involved, locals are frequently issued by a non-governmental person or entity for the primary purpose of appealing to the collectors' market.

recall, no other person had participated on Global's behalf in their negotiation (*Id.* 115); and that he could remember no occasion where a contract provision negotiated by him had been rejected by his principal (*Id.* 117). During all of these negotiations Hambrose was represented by Herman Finesod (*Id.* 111). Although Feigenbaum testified that he had conducted extensive negotiations with Finesod over a three-year period, search of his entire deposition does not disclose that he was able to remember a single word spoken by either negotiator (*Id., passim* ).

The fifty-three page contract which is claimed finally to have emerged from these negotiations constituted in effect a refinement of contracts said to have been negotiated in previous years, and is an extraordinarily complex instrument (Plaintiff's Exhibits 11, 236, 237, 238). Five paragraphs are devoted to defining the purchase price and manner of payment (Exh. 11, 4–5), the principal feature of which being a NON-NEGOTIABLE NONRECOURSE PROMISSORY NOTE annexed to the contract as Exhibit C. One paragraph of the contract obligates Global to suggest to Hambrose the names of two "appraisers" and to pay—up to $140 for each master—for two appraisals by persons selected by Hambrose, but does not obligate Hambrose to use any of the appraisals so provided (*Id.* 30).

Feigenbaum's deposition testimony does not suggest familiarity with any provision of the contract. For example, with respect to the last mentioned provision about appraisals, he didn't seem to remember how it had found itself in the contract (or how similar provisions had found themselves in previous contracts), or which of the parties had requested it (Feig. Dep. 147–9). With respect to payment of the purchase price, Feigenbaum was "not sure" that he knew "what a nonrecourse note was" (*Id.* 158–59).

With respect to Feigenbaum's knowledge about the affairs of his supposed principal and the circumstances in which he undertook to represent it in its negotiations with Hambrose, Feigenbaum "thought" Global's only office was in Tel Aviv, but was not sure (*Id.* 57–58); he did not know who its officers or directors were, except that—at the suggestion of his counsel—he corrected his answer to say that Michael Shine was its president (*Id.* 58); he had never been an officer of Global and had no power of attorney to evidence his authority to represent it in negotiations with Hambrose (*Id.* 64–66, 69); he had no recollection of any conversation with Shine in which such authority was conferred upon him, except that he remembered that "the understanding was the discussion be left to me" (*Id.* 111–12).

With respect to his knowledge of tax shelter problems, Feigenbaum admitted—when pressed—that at Finesod's request he had attended "quite a few" tax shelter seminars in a number of cities, including Miami, Los Angeles, Phoenix and Honolulu (*Id.* 167–75); and that at least by 1980 he was generally aware that stamp masters were being used in tax shelter programs (*Id.* 111). Despite these admissions he contended that his knowledge of tax shelter problems was only peripheral, and that he really didn't have "a full understanding of the tax aspects even now" (*Id.* 111). However, when asked what dealings he had had with a certain firm of attorneys, Feigenbaum testified (*Id.* 118, lines 7–10):

> I was asked to meet them and again to explain to them—I think I explained to Mr. Greenberg at one point about the tax shelter at the request of—

He then continued (*Id.*, lines 10–17):

> sorry. I am sorry, I made a mistake. I described my British local business to Mr. Greenberg about the middle of '79 for some reason.
>
> \*    \*    \*    \*    \*    \*
>
> I made a slip of the tongue before.[4]

**4.** In his essay on "Slips of the Tongue", republished in 1965 by W.W. Norton in a volume entitled *The Psychopathology of Everyday Life,* Sigmund Freud observed (at p. 64):

> It is a frequent occurrence for the idea one wants to withhold to be precisely the one which forces its way through in the form of a slip of the tongue.

We accept the witness' original testimony that he explained to Mr. Greenberg "about the tax shelter," and reject his recantation.

## TESTIMONY OF HERMAN FINESOD

The Government's direct examination of Finesod was relatively brief. With respect to his negotiations with Feigenbaum it was brought out that while he was aware that Feigenbaum represented Global, he could not recall how he came by that knowledge; "he [Feigenbaum] must have told me something like that" (Tr. 207). He never dealt with anyone else with respect to Global, although he believed that he had met Shine "one time very, very, briefly, just a matter of minutes" (Tr. 208, lines 14–16, cf. id. lines 9–13). Although familiar with Hambrose's 1979 Offering Memorandum which identified Feigenbaum as owner of Crailheath (Tr. 204), he was "not sure" that Feigenbaum did own Crailheath; he "believed he did," but was "not positive," and did not remember "exactly when [he] realized it" (Tr. 211). In any event, he never raised any question with Feigenbaum with respect to the possibility of conflict of interest growing out of his ownership of Crailheath and representation of Global (*Ibid*). With respect to the Finesod-Hersch negotiations which resulted in the establishment of Philatelic, the principal point developed on direct examination was that although these negotiations were "long and arduous" Hambrose's regular corporate counsel was the only attorney consulted (Tr. 215–17).

Cross-examination of Finesod was opened by counsel for Hambrose. After bringing out that Finesod and Hersch had first met in 1976 or '77 and that between 1978 and '81 Hersch had worked for various Finesod corporations in a "management capacity" (Tr. 243), counsel announced that he was going to deal largely with the Hambrose-Philatelic (Finesod-Hersch) relationship, leaving the Global-

Hambrose relationship to counsel for Philatelic and Hersch (Tr. 243). As established by stipulation, Hersch was the president of Hambrose in 1981. In that year Finesod, for reasons that are not altogether clear,[5] decided it might be useful to separate Hambrose from his other holdings (Tr. 245–7). This idea apparently made Finesod hospitable to a Hersch suggestion of the possibility of his "taking over the selling of stamp masters and handling that separately" (Tr. 247). When asked what Hersch had said in the conversation in which such suggestion was made, Finesod testified (Tr. 248):

> Well, he said he would like to be—to own the company and sell the stamp masters in the similar fashion to the way it was sold in 1981 and devote his full efforts to it, which he had been doing before anyway.
>
> I thought that that was a good idea, but we didn't go into a lot of detail at that time because it is a busy time of the year for us, the end of the year.

Turning to the conversations which ultimately ensued after the "end of the year," counsel asked Finesod to (Tr. 249):

> [t]ell the Court in substance what you said to Mr. Hersch, what Mr. Hersch said to you in this series of conversations about the creation of Philatelic Leasing and the change in business of Hambrose Stamps?

In answer to that question the witness could remember only two topics of conversation: (1) Finesod had wanted to sell to Hersch at a "high" price while Hersch had wanted to buy at a "low" price (Tr. 250–1); and (2) Hersch had wanted a loan of $100,000 in order to establish a "completely staffed office" (Tr. 251–2). With respect to the latter topic, Finesod, in the first place, had not thought $100,000 would be enough for the purpose and, in the second place, had not wanted to lend more than "40 to 50 thousand" (Tr. 251–2). The dilemma was resolved by an understanding that Hamb-

---

**5.** According to Finesod, a stamp or stamp master is a "non-security" which "doesn't have the scrutiny that a security would have," while other Finesod companies dealt in securities which had such "scrutiny"; and apparently if securities

and non-securities are dealt with by companies which—although separately organized—have common ownership a conflict might be created "with the broker-dealer selling a non-security and a security" (Tr. 246).

rose would take care of staffing Philatelic's office, at least at the beginning (Tr. 252). This understanding, however, didn't find its way into the contract ultimately arranged between Philatelic and Hambrose (Tr. 253).

The witness's general recollection having thus been exhausted, counsel directed his attention to the possibility that there might have been discussion about "exclusivity." This caused the witness to remember that there had indeed been such discussion and that it had constituted "a major bone of contention" (Tr. 253).

At the end of cross-examination by counsel for Hambrose, the Court expressed puzzlement as to why—if Finesod's main purpose in establishing Philatelic was to get Hambrose out of the "non-security" stamp business—he should have insisted on the proposition (which, according to previous testimony by Hersch [see, infra, at 1563–64] had almost wrecked the entire negotiation) that Hambrose retain the right to stay in that very business (Tr. 271). Finesod agreed that the negotiations almost fell apart on that particular point, but could not come up with any rational explanation as to why the issue had seemed so important to him (Tr. 272–4).

When counsel for Philatelic and Hersch took over the examination of Finesod, testimony was adduced to the effect that the Global-Hambrose (Feigenbaum-Finesod) negotiations had been long and difficult. Thus Finesod testified (Tr. 278):

Q. How long did the negotiations take to work out the terms of the agreement between Global and Hambrose?

A. It took some time. We disagreed on an awful lot of things.

Q. Was it in two sessions or—

A. Oh many, many sessions. Many, I don't know, at least ten.

As Hambrose was acquiring from Global rights which it could have acquired directly from Crailheath (Feigenbaum's company), it was necessary to establish what Finesod thought Global would contribute to the transaction. As to that, Finesod testified (Tr. 278–9):

Q. From the outset, what was Hambrose going to get from Global, if you could work out the deal?

A. They were going to receive the stamp masters, they were going to get the expertise—whatever expertise Global had and Mr. Feigenbaum [Crailheath's owner] had to help us understand the stamp business, which we didn't really know very well, and just help us in every way possible so we could put this program together.

Finesod next testified about two related problems which, between them, took "many meetings" to resolve: the minimum number of stamp masters Hambrose would be obligated to pay for in the first year; and whether Hambrose should have an "exclusive" or Global should retain the "right to be able to sell to others also" (Tr. 280–2). The witness had no very clear recollection of the details of these negotiations, but did remember that Feigenbaum had been an excessively difficult negotiator because he "always had difficulty coming to a decision saying yes or no" (Tr. 282).[6]

---

**6.** The pertinent testimony, in its entirety, was as follows (Tr. 280–83):

Q. What about the number of masters? Were you getting every master that Global had a right to bring into being?

A. I am not sure if I knew how many they had the rights for at that time, but we had the rights for 10,000. He we [sic] wanted the rights to as many as we could get. As it turns out, we didn't receive all the rights.

Q. Staying with that number of masters, was there any subject of discussion or negotiation on what Global could do with any other masters it had a right to make?

A. They wanted to have the right to be able to sell to others also.

Q. Sell what?

A. To sell stamp masters. We insisted on exclusivity and then we had a lot of negotiations on—since we insisted on exclusivity, on the minimum guarantees. That was a major negotiating factor.

Q. Explain that to the Court.

A. Well, we would like to have gotten exclusivity for paying or guaranteeing very little. We had no idea how much we could—how we would do with it.

Q. What were you guaranteeing? I think it is not clear.

A. I don't remember the number of masters that we had to buy, but it was a number—I

There followed some rather confusing testimony establishing that arrangements had been made whereby Norfolk Printing (of whose ownership Finesod was ignorant), or some other printer selected by Feigenbaum, would take care of printing whatever stamps should be required by the program (Tr. 291–3). There was also desultory testimony as to the terms of payment, Global's obligation to provide appraisers and appraisals, the attorneys involved in the negotiation, and other matters. Counsel then went back to the question of exclusivity and the witness—whose recollection had somehow refreshed itself [7]—categorically stated that Global was precluded from selling "to anybody else" (Tr. 296).

All in all it can be said of Finesod's testimony about his alleged negotiations with Feigenbaum—as was the case with Feigenbaum's on the same subject—that one can read it in its entirety without getting any clear notion as to how the supposed negotiations progressed or what considerations resulted in the supposed solution of any of the numerous issues said to have been under discussion (Tr. 278–96).

### TESTIMONY OF MELVIN HERSCH

Like Feigenbaum's, Hersch's testimony displayed an extraordinary ignorance about matters with which one in his purported

> don't recall exactly how many. I think it was over a hundred.
>
> Q. I just want to ask you a question on this point. Does that mean you had to take or pay for a minimum number of masters?
> A. Yes, we had to pay for a minimum number.
> Q. In order to get what other term?
> A. In order to keep it for the following year.
> Q. And that was a condition for exclusivity, is that what you are saying?
> A. Yes, that was a condition for exclusivity.
> Q. Did that take time to negotiate?
> A. Yes.
> Q. Was it—
> A. That took many meetings. That one point took a lot of meetings.
> Q. Where was the matter at issue? Was it in the number of guarantees or in the principle of exclusivity?
> A. It became mainly the guarantee amount, and Mr. Feigenbaum always had difficulty coming to a decision of saying yes or no. So it dragged on for a long time.
> Q. Did you find him to be a pleasant and pliant negotiator?

position would usually be familiar. Although he had been president of Hambrose from 1980–82, he had never—until the instant litigation—heard of the company of which Hambrose was a wholly-owned subsidiary (Tr. 106). He had no idea what, if any, other officers Hambrose may have had, who his predecessor as president had been, or who its directors may have been (Tr. 105–6). Although he recognized his signature on the Global-Hambrose contracts (by which Hambrose had acquired its only assets), he had no recollection of signing or even having seen those contracts (Tr. 109–10). Although aware that Feigenbaum had acted for Global in negotiating those contracts, he had no idea as to what—if any—connection Feigenbaum may have had with Global or how he came by his authority to speak for it (Tr. 113–15). When he finally became president and sole owner of Philatelic, Hersch was not allowed to issue checks without the co-signature of one Irwin Rosen, but he had no idea who Rosen was (except that he "works on the 15th floor") or by whom he may have been employed (Tr. 124). There are other peculiarities in his testimony—which was wide-ranging—but we shall concentrate on his account of the "long and arduous" negotiations by which he acquired and became president of Philatelic.

> A. No.
> Q. Was he an adversary worthy of your mettle?
> A. He was very, very difficult to deal with. One of the most difficult people I ever met.

7. As indicated in the previous footnote, the witness had said "I am not sure if I know how many they [Global] had the rights for at that time." However, continuing, he testified (Tr. 295–6):

> Q. I may have asked you this before:
> Do you know whether Global's sale to you of rights to masters included all of the masters it had rights to make from Crailheath? Do you know that?
> A. I know that it did not.
> Q. Explain that, please.
> A. Global I understand had the right to I think 40,000 masters, and we had the rights to only 10,000.
> Q. But could they sell those extra ones to anybody else?
> A. They couldn't sell it to anybody else.

Although Hersch was technically a Government witness, the details of his supposed negotiations with Hambrose (Finesod) were mostly developed on "cross" examination by his own counsel. These negotiations started in the last quarter of 1981 (Tr. 147). Their beginnings were thus described by the witness (Tr. 148–9):

Q. What did you say to Mr. Finesod?

A. I told Mr. Finesod that I thought I had been a salaried employee for a long enough time, and I would like to form my own company and be an entrepreneur.

Q. Did you elaborate in any sense what the nature of the business was and what you wanted to do?

A. I said I thought there was an interesting opportunity in the stamp industry and I would like to stay in that business.

Q. Did you distinguish in that conversation between the wholesale and the retail end of the business?

A. Yes, because my impression was that Mr. Finesod was not really interested in the retail end of the stamp business, that he had other businesses which attracted him more, and that I could then arrange for him to be the wholesaler and the company that I would form would then become the retailer.

Q. As a result of that conversation did you go into business for yourself?

A. Yes.

Q. What was the nature of the business you went into?

A. I formed a company which was going to buy stamp masters from Hambrose and was going to lease them to individuals.

Q. What was the name of that company?

A. Philatelic Leasing.

After further preliminaries, counsel got down to the details of the negotiations. The first matter discussed was the price Philatelic would pay to Hambrose, as to which the witness testified: "He wanted a certain number and I suggested another number and we negotiated until we arrived at a satisfactory number" (Tr. 151). This item was resolved in "probably three sessions" (Tr. 151). "[S]everal sessions" were devoted to "cash flow and down payment" (Tr. 151–3).

Counsel then asked if the witness could "recall any other issues that you negotiated on behalf of Philatelic with Mr. Finesod on behalf of Hambrose" (Tr. 153). The witness recalled a discussion about rent, which was resolved at the "figure of $2,000 a month" (Tr. 153–5). The witness was then asked if he could "think of another issue that was negotiated" (Tr. 154), and remembered a "bitter controversy" (counsel's words) about the amount of the loan that Finesod would advance, which was ultimately settled "somewhere around 40 or 50 thousand" (Tr. 155). After having obtained the witness' acquiescence as to the existence of certain other controversies, counsel finally succeeded in focussing attention on the "exclusivity" issue (Tr. 157–8):

Q. Was there a question that you raised about whether or not Hambrose could sell stamps to anybody else?

A. Oh, yes.

    \*     \*     \*     \*     \*     \*

Q. Tell me about that.

A. I had seen a contract between Hambrose and Global which gave Hambrose an exclusive right to market the masters. Mr. Finesod refused to give Philatelic that exclusive right, and he retained for himself the right to choose others, but we had an exclusive where we could only buy stamp masters from him but he could sell to others as well if he chose to. We negotiated for hours on that subject, very angry, and I was very, very upset about that, because I could see no reason why he wouldn't give us the same rights, but he was adamant and I eventually felt I had to give in on that point.

Q. What was the ultimate on that?

A. The ultimate is that he retained the right to sell masters to others other

than Philatelic, but Philatelic could only buy masters from Hambrose.

Q. Was he aware of your feeling about that subject?

A. I certainly hope so. We yelled about it enough.

The witness then explained that although Finesod had insisted on ramming through this provision over heated and angry objection, he never availed himself of the privilege thus retained (Tr. 158). In attempting to gain insight into Finesod's possible motive for such conduct, the Court engaged in the following colloquy with the witness (Tr. 160):

THE COURT: This argument you had about his right to sell to others, was that a very heated discussion?

THE WITNESS: Yes, that was a very heated discussion.

THE COURT: Do you have any idea why he got so excited about it if he had no intention of doing it?

THE WITNESS: He may have had other reasons. I don't know what his reasons were ...[.]

It thus appears that neither Finesod nor Hersch could come up with an explanation of Finesod's supposed conduct in jeopardizing the entire Hambrose-Philatelic negotiations over an apparently meaningless issue. An additional dimension of unreality is added to the whole issue of "exclusivity" by the realization that, while Finesod and Hersch both testified that Philatelic had been unsuccessful in obtaining exclusive rights from Hambrose, the defendants gave precisely contrary information to the public. Thus, "Philatelic's Policy and Procedure Guide" states that Philatelic obtained the rights to lease the stamp masters through a "series of exclusive contracts commencing with the owners of the islands themselves, and culminating with *an exclusive contract to Philatelic* to purchase the plates and produce the stamps" (Govt.Ex. 15, p. 582; emphasis supplied; *see also* the first thirty seconds of Philatelic's fifteen minute video cassette received in evidence as Government Ex. 400.)

## FINDINGS OF FACT

As suggested at the outset of this opinion, the testimony of Feigenbaum, Finesod and Hersch has persuaded us that there never was any negotiation between Global, Hambrose and/or Philatelic, but that these entities were instruments of a conspiracy between these three men and others mentioned in the evidence to create abusive tax shelters; and that the various contracts offered in evidence were not the product of negotiation but were simply items in a scheme carefully orchestrated by attorneys—presumably those to whom Feigenbaum explained "about the tax shelter" (Feig.Dep. 118)—employed for the purpose.[8]

The considerations which bring us to these conclusions can be summarized under three headings: (a) the impressions the witnesses made at trial; (b) the extreme improbability of their testimony on at least four points; and additionally (c) the impossibility—almost to a mathematical certainty—of their testimony on at least two material issues.

At the trial we gathered the distinct impression—which was confirmed by analysis of the transcript—that Finesod and Hersch were not in the least concerned with the truth, but were interested only in withholding evidence when questioned by the Government and in trying—sometimes unsuccessfully—to figure out what their own counsel wanted them to say when the latter took over the questioning. In the case of Feigenbaum we, of course, had no opportunity to observe his demeanor and he was subjected to no significant questioning by counsel for any defendant. However, examination of his entire deposition leads inexorably to the conclusion that he, also, was concerned not with the truth but only with preventing the emergence of any relevant information—favorable or unfavorable.

As to probability, it will be remembered that while it was the Government's contention that—as we have found—there were

---

**8.** We note that the record clearly establishes that no attorney appearing in this lawsuit was in any way concerned with the circumstances giving rise to the litigation.

no meaningful negotiations of any sort, the defendants took the position that Global, Hambrose and Philatelic were independent corporations, each looking out for its own self-interest. Accepting, *arguendo*, the defendants' position in this respect, we find the following elements of testimony—among others—incredible as a matter of law:

(A) That Global should have retained as its sole negotiator with Hambrose a person who—as owner of Crailheath—would have had an overriding self-interest in eliminating Global from the transaction and making a direct contract with Hambrose;[9]

(B) That if for some undisclosed reason it had been necessary to retain such a person to conduct negotiations, he would have been so retained without having any conversation with his principal except one leading to a general "understanding" that "the discussion be left to me" (Feig.Dep. 112);

(C) That Feigenbaum and Finesod could have negotiated with each other for a period of more than three years without being able to remember a word that either of them spoke in all that time.

(D) That Feigenbaum—over the same period of time—could have negotiated a series of contracts culminating in the Global-Hambrose 1982 agreement without being able to express familiarity with a single provision of the ultimate agreement or of any of its predecessors.

With respect to the testimony about the Hambrose-Philatelic negotiation, we simply observe that the record does not even suggest a theory under which Hersch—who "thought [he] had been a salaried employee for a long enough time"—could have developed the bargaining power to subject his employer to "long," "arduous" and "bitter" negotiations as to the terms under which the latter would set him up in business.

The two material issues as to which testimony was "impossible" relate to the purported Global-Hambrose negotiations. In

the first place, it will be remembered that those negotiations were supposed to be about the terms under which Global would manufacture stamp masters for Hambrose. As counsel for Philatelic aptly observed in their post-trial memorandum (at p. 6):

> The production of the stamp masters involved the selection and creation of the images to be depicted on the stamps, and required the services of artists and technicians, and the use of raw materials, equipment and capital.

It is obvious, therefore, that any negotiator for Global would have had to be fully familiar with all these factors in order to determine his principal's basic cost of manufacture. However, Feigenbaum's testimony—if it were to be believed—would conclusively establish that he never had the opportunity to learn anything about Global's business.

Looking at the negotiations from Hambrose's point of view (since it was negotiating to acquire from Global stamp masters Hambrose itself could as easily have manufactured under license from Crailheath), it would have been essential to meaningful negotiations for Hambrose to be advised as to what services not available from Crailheath Global could provide. Again, if we were to accept Feigenbaum's testimony as truthful, it would conclusively appear that he knew nothing about Global and could not have furnished any such information.

## CONCLUSIONS OF LAW

Two interrelated legal principles govern the conclusions to which the foregoing findings lead us. The first of these, which Wigmore has described as "one of the simplest in human experience" is that when a litigating party resorts to "falsehood or other fraud" in trying to establish a position, the court may conclude the position to be without merit and that the relevant facts are contrary to those asserted by the party.[10] The second is that where a party withholds (or seeks to suppress) relevant evidence within its control, the court

---

**9.** It will be recalled that the Crailheath-Global contracts preserved in Crailheath the right to license stamps to competitors of Global (Exhibits 241–244, *see* Feig.Dep. 99).

**10.** Wigmore's full statement of this proposition appears at 2 Wigmore, Evidence § 278 [Chadbourne rev. 1979] at 133, as follows:

may conclude that such evidence would be harmful to the party's cause.[11]

The rationale underlying these principles is that a litigating party must—of all persons—be knowledgeable of the facts supporting its own position, and if it falsifies—or seeks to suppress—relevant evidence, such conduct may be taken as an admission that the true facts would defeat the position the party is seeking to maintain.

■ In the case at bar, it is apparent that defendants should have been knowledgeable as to the value of their stamp masters. Among other things, they had at their disposal Feigenbaum's considerable experience in the stamp collecting business. Against this background, they did the following: (1) they elected to adopt "Arms Length" negotiations as a primary means of showing that their masters were not "Grossly Overvalued" within the meaning of the statute; (2) they fabricated a compli-cated skein of false evidence to establish the existence of such negotiations; and (3) they (as exemplified by the Feigenbaum deposition)[12] sought to suppress any evidence that might shed light on the issue being litigated.

By this conduct, the defendants were, in effect, telling the Court that the true facts—if known—would disclose that there had been no "Arms Length" negotiations; and that the stamp masters were, indeed, "Grossly Overvalued" within the meaning of the statute. We accept as clear and convincing the evidence thus provided by the defendants, and so conclude and determine.

## SECONDARY FINDINGS AND CONCLUSIONS

The Government's secondary position is that—regardless of whether or not negotia-

---

It has always been understood—the reference, indeed, is one of the simplest in human experience—that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly against the whole mass of alleged facts constituting his cause. (Emphasis in original.)

This doctrine, of course, is subject to the proviso that the trier of fact's mere disbelief of a witness' denial of an isolated fact cannot itself establish the existence of that fact. *Pariso v. Towse* (2d Cir.1930) 45 F.2d 962, 964. Here, we are not concerned with any particular fact that any of the witnesses may have denied, but draw inferences from their conduct in deliberately going forward with a complicated scheme of concealment and fabrication.

**11.** This proposition was clearly—and conclusively—set forth by the United States Supreme Court in *Interstate Circuit, Inc. v. United States* (1939) 306 U.S. 208, 225–226, 59 S.Ct. 467, 473–74, 83 L.Ed. 610:

The production of weak evidence when strong is available can only lead to the conclusion that the strong would have been adverse. (Citations omitted). Silence then becomes evi-dence of the most convincing character. (Citations omitted.)

*See also Golden State Bottling Co. v. N.L.R.B.* (1973) 414 U.S. 168, 174, 94 S.Ct. 414, 420, 38 L.Ed.2d 388 (permissible to draw inference from failure to call a witness that such witness' testimony would not have been helpful); *N.L. R.B. v. Dorn Transportation Co.* (2d Cir.1969) 405 F.2d 706, 713 (failure to call company president to testify on issue of company's motivation for discharging plaintiff employee permits adverse inference); *Mid-Continental Petroleum Corp. v. Keen* (8th Cir.1946) 157 F.2d 310; *Goldie v. Cox* (8th Cir.1942) 130 F.2d 695, 719 ("where relevant evidence is within the control of the party to whose interest it would naturally be to produce it, and he fails so to do, without satisfactory explanation, and produces no evidence or weaker evidence, an inference is justifiable that it would be unfavorable to him"). We are mindful that "the inference from the nonproduction of evidence cannot be availed of by a party having the burden of persuasion 'until the burden of producing evidence has shifted.'" *Vanity Fair Paper Mills, Inc. v. FTC* (2d Cir.1962) 311 F.2d 480, 486, *quoting* Wigmore on Evidence (3d Ed.1940). It is apparent, however, that the natural inferences flowing from the stipulated facts noted at page 1557 of this opinion were more than sufficient to shift the burden of production to defendants, who proceeded to present a lengthy (if unpersuasive) rebuttal to the Government's case.

**12.** It will be recalled that we have found that the defendants on trial before us concurred in Feigenbaum's strategy of silence.

tions between Global, Hambrose and Philatelic were sham—expert testimony established that the market for the stamps produced by these masters was so meagre as to require the conclusion that the masters themselves were without substantial value. As to this, it is defendants' position that the stamp masters have been in existence for so brief a time that it would be impossible for any expert to form an opinion sufficiently firm to overcome the presumption arising from the purchase prices claimed to have been established by "Arms Length" negotiation between the three named entities. The defendants also offered expert testimony of their own purporting to show that the market for those stamps was adequate to support at least half of the prices claimed for the masters.

Without deciding the question, we are inclined to agree with defendants that, *had the purchase prices in fact been established by arms length negotiations*, the Government's expert testimony might have been inadequate to rebut the strong presumption that would arise from such negotiated prices. But the concept of "Arms Length" negotiations having been eliminated from the case by our finding that there had been no negotiations at all, we conclude that the Government's expert testimony was wholly sufficient clearly and convincingly to establish that the masters themselves had no substantial value and considerably less than half that asserted by defendants. As to defendants' expert testimony, we found some of their witnesses to be quite impressive, but the sum total of their testimony wholly unpersuasive.[13]

## THE GOVERNMENT'S ENTITLEMENT TO INJUNCTIVE RELIEF AND THE CASE AGAINST HAMBROSE

It seems difficult to imagine a situation more suited to injunctive relief. Not only did the defendants engage in chicanery and fraud, but they continue to be so engaged to this very day. Eight trial days and untold numbers of pre- and post-trial hours had to be devoted to this proceeding, where a few honest answers by any one of the witnesses we have been discussing would have brought the whole investigation to a conclusion in a matter of hours.

As to the case against Hambrose, if it's owner was willing to let his corporation become a mere cog in an ongoing conspiracy, neither he nor the corporation has cause to complain if it is enjoined from such shenanigans in the future.

## CONCLUSION

In summary: We find that the Government has established all its contentions by clear and convincing evidence, and is entitled to the relief which it seeks. Let it submit an appropriate judgment on twenty days notice.

SO ORDERED.

---

13. One of the difficulties in defendants' attempt to use expert testimony to establish value is the circumstance that—so far as the record indicates—no one besides the defendants had ever tried to sell a stamp master to anyone at any price (see footnote 1, *supra*). This makes it hard to find a firm basis upon which to predict the price that would be arrived at by a willing buyer and a willing seller. All this rather puts one in mind of a supposed dinner table conversation which is said to have ended in the following exasperated exchange: "Does your sister like cheese?" "I don't have a sister." "Well, if you did have a sister would she like cheese?" The defendants' experts could well be likened to experts in gastronomy who postulated a most complicated dietary regimen which would induce the hypothetical sister to like cheese, if she could ever be found.