Melvin **HERSCH**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

No. CV–86–3159.

United States District Court,
E.D. New York.

March 17, 1988.

Kostelanetz & Ritholz by: Jules Ritholz, Ed Kesselman, and Gold & Wachtel by: Elliot Silverman, New York City, for Hersch.

Thomas O. Rice, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., for U.S.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

This action was commenced by plaintiff for a refund of a civil penalty assessed against him by the Internal Revenue Service pursuant to 26 U.S.C. § 6700 for promotion of an "abusive tax shelter." This matter is before the Court on the parties' cross-motions for summary judgment. Plaintiff alleges that the portion of the statute penalizing promoters of tax shelters who make "gross valuation overstatements" is unconstitutionally vague on its face. Alternatively, plaintiff claims he is entitled to a partial refund on the ground that the government's assessment exceeds the amount authorized by statute. Defendant claims that the penalty was properly calculated pursuant to § 6700 of the Internal Revenue Code and that plaintiff is collaterally estopped from challenging the finding that the disputed items were grossly overvalued because the issue has already been adjudicated.

The following facts, derived from the parties' 3(g) statements and responses to requests for admissions, are not in dispute.

In 1982 plaintiff was president of Philatelic Leasing Ltd. ("Philatelic"). Philatelic acquired and offered "stamp masters" for lease to the public. Stamp masters are printing plates used to produce stamps. These stamp masters, bearing the names of one of four private islands off the coast of Scotland, were purchased from Hambrose Stamps, Ltd. ("Hambrose"), of which plaintiff had previously served as president.

Hambrose, in turn, had purchased them from Global International Ltd. ("Global"). Philatelic purported to purchase the masters at prices ranging from $150,000 for a two-stamp master to $400,000 for an eight-stamp master. However, little cash changed hands because the purchase price took the form of non-recourse notes, and the cash payments were deferred. Philatelic bought a total of 830 masters. It then offered to lease the stamp masters to members of the public. Philatelic prepared an offering memorandum which contained the opinion of a law firm that the lessee of the stamp master would be able to claim federal income tax deductions as well as an investment tax credit equal to 10% of Philatelic's purchase price from Hambrose. The memorandum estimated the potential tax benefits as four times the lessee's cash investment.

At least 800 leases were entered into, each for a seven-year period. Philatelic then furnished to each lessee a statement of valuation of each stamp master so as to allow an election to pass through the investment tax credit as provided by § 48(d) of the Internal Revenue Code.

The United States brought suit against plaintiff in the United States District Court for the Southern District of New York to enjoin the scheme. The government alleged that the valuation of the stamp masters exceeded 200 percent of their fair market value and that such valuations constituted "gross valuation overstatements" within the meaning of 26 U.S.C. § 6700. The district court found, based primarily upon the testimony of three witnesses, that the entire stamp master scheme was a conspiracy to perpetrate tax fraud and that Mr. Hersch had made gross valuation overstatements as to one or more of the stamp masters involved. *United States v. Philatelic Leasing, Ltd.*, 601 F.Supp. 1554 (S.D.N.Y.1985), *aff'd*, 794 F.2d 781 (2d Cir.1986).

Mr. Hersch was then assessed a penalty pursuant to 26 U.S.C. § 6700(a)(2)(B). 26 U.S.C. § 6700(a) provides in pertinent part:

"Any person who—

(1)(A) organizes (or assists in the organization of)—

    (i) a partnership or other entity,

    (ii) any investment plan or arrangement, or

    (iii) any other plan or arrangement, or

(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes (in connection with such organization or sale)—

. . . .

(B) a gross valuation overstatement as to any material matter, shall pay a penalty equal to the greater of $1,000 or [10][1] percent of the gross income derived or to be derived by such person from such activity."

The government calculated the penalty by assessing a $1,000 fine for each sale in which plaintiff participated. The government maintains that plaintiff took part in 800 sales and as such could be fined $800,000. However, in its administrative discretion, the government reduced the penalty to $234,600 so as not to exceed plaintiff's gross income from Philatelic in 1982 and 1983.

On February 27, 1987, plaintiff paid the IRS a sum amounting to 15% of the penalty assessed against him. At the same time, he filed a claim for a refund. The IRS took no action for six months, and on September 23, 1987, this action was commenced.

### Void–For–Vagueness

■ The disputed statute calls for a penalty to be imposed on any person who makes or furnishes a gross valuation overstatement as to any material matter relating to an abusive tax shelter. The statute defines "gross valuation overstatement" as "any statement as to the value of any property or services if the value so stated exceeds 200 percent of the amount determined to be the correct valuation." 26 U.S.C. § 6700(b)(1)(A).[2]

Plaintiff claims that the words "correct valuation" are so vague and its interpretation so unpredictable that the statute fails to give the citizen fair warning of what is prohibited. As such, the statute deprives the plaintiff of his property without due process of law in violation of the fifth amendment.

Plaintiff challenges that facial validity of the statute. However, generally, a challenge to tax or civil laws on vagueness grounds must be specific rather than facial. *See United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975); *United States v. MacKenzie*, 777 F.2d 811 (2d Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986).

The stricter facial invalidity test will only be used when the statute affects first amendment rights, *United States v. Mazurie, supra*, or where a penal statute impacts upon important constitutional rights, *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

Where, however, as here, civil penalties are imposed in the area of economic regulation, a different test applies. *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *United States v. National Dairy Products Corp.*, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952); *United States v. Sun & Sand Imports, Ltd.*, 725 F.2d 184 (2d Cir.1984).

The statute must be examined in light of the facts of the case at hand. *Mazurie,*

---

**1.** The Tax Reform Act of 1984 raised the percentage from 10% to 20%. Pub.L. No. 98–369, 98th Cong., 2d Sess. This amendment is inapplicable to this case because its effective date was July 18, 1984.

**2.** Note that § 6700(b)(2) gives the IRS the authority to waive the penalty:

"The Secretary may waive all or any part of the penalty provided by subsection (a) with respect to any gross valuation overstatement on a showing that there was a reasonable basis for the valuation and that such valuation was made in good faith."

*supra.* The fact that there may be some doubtful cases under the challenged statute does not void it for vagueness if the particular case presented is not doubtful. *United States v. MacKenzie, supra,* 777 F.2d at 816. One to whom the statute validly applies may not avoid the reach of the statute by contending that it would be unconstitutional as applied in some hypothetical situation. *Raines v. United States,* 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

In the instant case, since the plaintiff was sufficiently forewarned that his conduct was unlawful under the terms of the statute, that statute is constitutional as applied to him. Plaintiff was put on notice that he might not double the "correct valuation" of the property he was promoting in order to inflate the tax benefits available. The district court found that there was clear and convincing evidence that "the masters themselves had no substantial value and considerably less than half that asserted by [defendants]." *United States v. Philatelic Leasing Ltd., supra,* 601 F.Supp. at 1567. In its affirmance, the Second Circuit noted that Hambrose agreed to purchase the stamp masters from Global for a price far exceeding Global's purchase price. This "incredible mark-up" was again increased upon resale to Philatelic. Thus, what began as a $3.60 price per master for the right to produce 10,000 stamp masters resulted in purchased by Philatelic at prices ranging from $150,000 to $400,000. As noted, very little money actually changed hands because more than 90% of the purchase price was in the form of non-recourse notes to be paid out of the revenue derived from the shelters. Cash did not change hands until a taxpayer enters a lease and activated the arrangement whereby Philatelic purchased the stamp masters from Hambrose who purchased them from Global. *United States v. Philatelic Leasing Ltd., supra,* 794 F.2d at 784. On the facts of this case, there can be no serious contention that the definition of gross valuation as an amount in excess of 200% of the correct valuation was too vague to put plaintiff on notice. The district court pointed out that defendants "should have been knowledgeable as to the value of their stamp masters." 601 F.Supp. at 1566. They could not claim that they did not know the correct valuation of the masters. Nor is there any doubt that the evidence presented at trial clearly established that the stamp masters were grossly over-valued. 794 F.2d at 785.[3]

Plaintiff suggests that, because the statute does not require a finding of knowing and intentional conduct, the problem of uncertainty and vagueness is aggravated. Plaintiff is correct in pointing out that § 6700(a)(2)(B) does not require scienter to find a violation of the gross overstatement provision. *United States v. Turner,* 601 F.Supp. 757, 767 (E.D.Wis.1985), *aff'd sub nom. United States v. Smith,* 787 F.2d 595 (7th Cir.1986). Nevertheless, the absence of a scienter requirement does not impose an insurmountable problem of constitutional vagueness. The inclusion of a scienter requirement may mitigate the vagueness of a statute, *Hoffman Estates, supra,* 455 U.S. at 499, 102 S.Ct. at 1193–94, but its absence does not dictate a finding of uncon-

---

**3.** Plaintiff points to a number of cases in which statutes containing terms related to reasonable valuations or rates were struck down as impermissibly vague. For example, in *Collins v. Kentucky,* 234 U.S. 634, 34 S.Ct. 924, 58 L.Ed. 1510 (1914), the state statute prohibiting price fixing above or below "real value" was struck down as overly vague because it prescribed no knowable standard of conduct. Similarly, in *United States v. L. Cohen Grocery,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921), the Court held that a law forbidding "any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries" was unconstitutionally vague. Plaintiff suggests that the "correct valuation" of property is similarly unascertainable and specu-

lative. Note, however, that plaintiff has not cited an analogous case decided after 1935. This is because the void-for-vagueness doctrine has its origins in the period of the reign of substantive due process at which time it was successfully used exclusively in cases involving economic legislation. Once the New Deal Court came into being, economic vagueness cases fell out of favor, *see* Note, The Void-For-Vagueness Doctrine in the Supreme Court, 109 *U.Penn.L. Rev.,* 67, 74 n. 38. The same note points out that in all of those cases, including those cited by plaintiff, there lurked some other claim of liberty from government restraint which may have influenced the Court to find the vagueness argument more compelling. *Id.* at 75 n. 39.

stitutionality. It is simply a factor to be weighed in the analysis.

In the present case, there is no basis for an argument that plaintiff was an unknowing violator of § 6700. The court that heard the injunction suit found that plaintiff knew or should have known the true value of the stamp masters. Although in the abstract, the lack of a *mens rea* showing might weigh in favor of a finding of vagueness, as applied to the plaintiff in this case, it is of little consequence.

■ Plaintiff also suggests that this statute falls into one of the two categories of statutes for which a void-for-vagueness challenge is successfully made to the face of the statute rather than as it is applied. First, plaintiff contends that the statute impacts upon his first amendment right to free speech because it penalizes the making of "any statement as to the value of any property" which "exceeds 200 percent of the amount determined to be the correct valuation," and as such stricter standards of permissible statutory vagueness may be applied. *See, e.g., Cramp v. Board of Public Instruction*, 368 U.S. 278, 287, 82 S.Ct. 275, 281, 7 L.Ed.2d 285 (1961); *Hoffman Estates, supra*, 455 U.S. at 499, 102 S.Ct. at 1193–94.

Plaintiff's representations were, however, made in connection with his efforts to promote a scheme of tax shelters and thus constitute commercial speech. *United States v. White*, 769 F.2d 511 (8th Cir. 1985); *United States v. Buttorff*, 761 F.2d 1056 (5th Cir.1985); *United States v. Smith*, 657 F.Supp. 646 (W.D.La.1986), *aff'd*, 814 F.2d 1086 (5th Cir.1987); *Joslin v. Secretary, Dep't of Treasury*, 616 F.Supp. 1023 (D.C.Utah 1985), *aff'd*, 832 F.2d 132 (10th Cir.1987). The use of commercial speech to promote illegal conduct is not within the protection of the first amendment and may be regulated or barred entirely by the government. *Hoffman Estates, supra*, 455 U.S. at 496, 102 S.Ct. at 1192; *United States v. White, supra*, at 516. Thus, plaintiff gains nothing by characterizing his activity as "speech."

Second, plaintiff claims that the statute falls into the category of penal statutes to which a more stringent vagueness test applies. The statute must

> "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."

*Kolender, supra*, 461 U.S. at 357, 103 S.Ct. at 1858. The Supreme Court has noted that the more important aspect of this standard is the requirement that minimal guidelines be established to prevent standardless enforcement. *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). Although plaintiff is correct that the vagueness doctrine has been extended to include civil statute. *Hoffman Estates, supra*, 455 U.S. at 497, 102 S.Ct. at 1193, the Court has repeatedly remarked that the standard for a statute imposing civil penalties is less severe than for criminal penalty statutes. *Id.* at 499, 102 S.Ct. at 1193–94.

Despite plaintiff's contentions, there is little risk of arbitrary enforcement under the terms of this statute. The statute's guidelines as to what constitutes "gross valuation overstatement" is sufficiently focused to prevent arbitrary application of the law. Furthermore, the statute authorizes the IRS to waive its enforcement power when the overvaluation occurred in good faith. Although such a provision cannot save an otherwise flawed statute, given the statute's sufficiently clear terms, the risk of discriminatory enforcement is minimal.

Moreover, there is no evidence that the statute was applied to Mr. Hersch in a discriminatory or arbitrary manner.

### Assessment of the Penalty

■ The IRS contends that each lease of a stamp master was a separate "activity" within the meaning of the statute. As such, it argues the $1,000 penalty may be applied to each of the 800 sales in which plaintiff participated for a total penalty of $800,000.

Plaintiff, on the other hand, suggests that the activity referred to in § 6700(a)(2)(B) refers to the occupation of

organizing or selling tax shelters. The $1,000 amount is simply the minimum penalty which will be imposed for a violation of this provision of the tax laws. Otherwise, a percentage of gross income from the whole project is the applicable penalty.

A number of district courts have been faced with these contentions, but the resolutions have not been uniform: a few have been convinced that the IRS' interpretation is correct. *Johnson v. United States,*[4] 677 F.Supp. 529 (E.D.Mich.1988); *Waltman v. United States,* 618 F.Supp. 718 (M.D.Fla. 1985); *Bean v. United States,* 618 F.Supp. 652 (N.D.Ga.1985). Others have found that the taxpayers' reading is more consistent with the language and history of the statute. *Spriggs v. United States,* 660 F.Supp. 789 (E.D.Va.1987); *Bond v. United States,* No. 87–1122; slip op. (C.D.Cal. Dec. 22, 1987) (following *Spriggs*). I find the reasoning of the *Spriggs* court more compelling and, for the following reasons, I find the taxpayer's reading of the statute to be the appropriate one.

Both parties claim that the plain language of the statute dictates a finding in their favor. However, I find plaintiff's reading of the statute's language more plausible. The word "activity" is used for the first time in the statute in the penalty provision, in contrast to the earlier use in section (a)(2) of the term "organization or sale." Had Congress intended to apply the penalty to each sale, it could have continued to use the phrase "such organization or sale" instead of "such activity." The substitution of the word "activity" demonstrates that Congress was referring to the collective activity of organizing or selling abusive tax shelters.

The government suggests that the phrase "organization or sale" could not be used because it is too limited in scope. It would not include those who "assist" or "participate" in a sale or organization. Nor would it be clear that the statute requires that liability be imposed only when a false statement or gross valuation overstatement is made. Such a reading distorts the language of the statute. The prior portions of § 6700(a) explicitly provide that one who "assists in the organization of" or "participates in the sale of" any form of an abusive tax shelter is liable under that provision. The use of the phrase "organization or sale" in the penalty portion would not cast doubt on the culpability of those who assist or participate. Nor would the "and" which links § 6700(a)(1) and (a)(2) be lost.

In addition, as the *Spriggs* court noted, whenever Congress intended a separate penalty be assessed for each individual action, the language used was explicit. For example, the penalty for failure to furnish a statement to an employee, 26 U.S.C. § 6678, or to supply a taxpayer identification number, 26 U.S.C. § 6676, or to supply information on a place of residence, 26 U.S.C. § 6687, applies to "each such failure." In addition, the penalty for failure by a broker to provide notice to payors is "$500 for each such failure," 26 U.S.C. § 6705; the penalty for failure to show information on a debt instrument is "$50 for each instrument with respect to which such failure exists," 26 U.S.C. § 6706; and the penalty for failure to furnish tax shelter identification numbers is imposed "for each such failure," 26 U.S.C. § 6707(b). Similarly, in a situation not involving the failure to act, the individual who aids and abets in the understatement of tax liability must pay a penalty "with respect to each such document." 26 U.S.C. § 6701(a). In view of Congress' care in specifying the situations in which penalties are imposed upon each occurrence of the violation, the presumption tends toward a reading of the penalty provision as applying the whole activity rather than to individual transactions.

The most compelling argument for plaintiff's interpretation is based on the legislative history. Although the enacting Con-

---

**4.** Although the court in *Johnson* carefully analyzed the problem, it found only one prior case, namely, *Waltman.* Neither *Spriggs* nor the legislative history discussed *infra* was mentioned.

gress provides no guidance,[5] the history of the 1984 amendment to the provision is extremely helpful. The House Committee Report on the 1984 Act that raised the penalty from 10% to 20% of income derived from the activity states:

> "The bill increases the penalty for promoting abusive tax shelters to the greater of 20 percent of the gross income derived, or to be derived, from the activity, or $1,000. The Committee did not increase the $1,000 penalty because, as originally enacted, the $1,000 was intended to be a minimum penalty on small promoters who derive little income from the deals they promote."

H.R.Rep. No. 432, 98th Cong., 2d Sess. 1, 1357–1358, *reprinted in* 1984 U.S.Code Cong. & Admin.News, 697, 1009. The report made clear that the $1,000 amount was not to be compounded as a means of punishing high volume tax shelter promoters. Rather, it set a minimum to be applied when the 10% of gross income from the activity fell below $1,000.

The government argues that the opinion of a Congress subsequent to the Congress that enacted section 6700 deserves little weight. However, the Supreme Court has repeatedly held that a subsequent legislature declaring the intent of an earlier statute is entitled to "significant weight." *NLRB v. Bell Aerospace,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974); *Bell v. New Jersey,* 461 U.S. 773, 784, 103 S.Ct. 2187, 2194, 76 L.Ed.2d 312 (1983). Although a subsequent Congress cannot override the unmistakable intent of the enacting one, later views are entitled to significant weight when the precise intent of the enacting Congress is obscure. *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 813–14, 63 L.Ed.2d 36 (1980). Since the Congress of 1982 failed to explain its enactment, the reading given to it in 1984 is of particular significance.

The government also suggests that the Committee Report can be read in a way

which is consistent with the IRS' argument. The government argues that the Committee was concerned that the existing penalty was not a sufficient deterrent for promoters who derived more than $10,000 from each "sale," and so they raised the percentage. However, for those operating on a small scale, the $1,000 minimum per sale was adequate. This interpretation strains the language of the report. Even the first sentence of the report makes clear that the alternatives are either 20 percent of gross income or $1,000 total. The $1,000 penalty is not related to the amount derived from the activity, but rather an absolute minimum amount.

Finally, the government points out that Congress saw the need for an amendment because the 10% penalty was not significant enough to deter behavior. The government argues that plaintiff's suggestion that the penalty should be $23,400 on gross income totalling $234,600 does not further the clear goal of the legislature to deter the organization of abusive tax shelters. Nevertheless, Congress did not choose to impose a penalty of total forfeiture of all income derived from abusive tax shelter schemes. Rather, it chose a percentage penalty. The government is clearly mistaken when it intimates that Congress' true intention was not a 10% or 20% penalty, but rather a 100% forfeiture.

### Collateral Estoppel

The government urges in its motion for summary judgment that plaintiff is collaterally estopped from denying that each of the 800 stamp masters was grossly overvalued within the meaning of the statute because that issue was necessarily fully litigated in the injunction action. Presumably, the government makes this argument to preclude plaintiff's claim that the $1,000 penalty cannot be imposed on each sale without additional proof on the part of the IRS. In light of my finding that the penalty should not be imposed on each individual sale but rather on the gross income from

---

5. Section 6700 was enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. 97–248.

the entire activity, the issue of estoppel as to the individual sales is moot.

Because of the government's incorrect assessment of the penalty, the Court denies defendant's motion for summary judgment and grants plaintiff's motion for summary judgment for a partial refund.

The parties are directed to settle judgment on notice.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.