**Allen J. RENO, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. J86–0251(L).**

United States District Court, S.D. Mississippi, Jackson Division.

July 6, 1989.

Allen J. Reno, Jackson, Miss., pro se.

Phillip L. Sbarbaro and Marilla Lane Ross, Trial Atty., Tax Div., Office of Sp. Litigation, Dept. of Justice, Washington, D.C., for defendant.

### MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

On August 12, 1985, the Internal Revenue Service assessed penalties against the plaintiff, Allen G. Reno, totalling $452,000 pursuant to 26 U.S.C. § 6700. Reno paid a portion of the penalty and then instituted the present action to contest the penalty assessment on the basis that his activities were not violative of section 6700 and claiming alternatively that the amount of the penalty assessed by the Service was erroneous since it was based on an improper method of calculation. The government counterclaimed, seeking recovery of the balance of the assessed penalty. Following an evidentiary hearing and the parties' submission of post-trial memoranda on the issues raised, the court makes the following findings and conclusions.

Section 6700, which proscribes abusive tax shelters, provides as follows:

(a) Imposition of penalty.—Any person who—

(1)(A) organizes (or assists in the organization of)—

(i) a partnership or other entity,

(ii) any investment plan or arrangement, or

(iii) any other plan or arrangement, or

(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes (in connection with such organization or sale)—

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter,

shall pay a penalty equal to the greater of $1,000 or 10 percent of the gross income derived or to be derived by such person from such activity.

(b) Rules relating to penalty for gross valuation overstatements.—

(1) Gross valuation overstatement defined.—For purposes of this section, the term "gross valuation overstatement" means any statement as to the value of any property or services if—

(A) the value so stated exceeds 200 percent of the amount determined to be the correct valuation, and

(B) the value of such property or services is directly related to the amount of any deduction or credit allowable under chapter 1 to any participant.

(2) Authority to waive.—The Secretary may waive all or any part of the penalty provided by subsection (a) with respect to any gross valuation overstatement on a showing that there was a reasonable basis for the valuation and that such valuation was made in good faith.

(c) Penalty in addition to other penalties. —The penalty imposed by this section shall be in addition to any other penalty provided by law.[1]

Reno does not dispute that the tax shelter promotions at issue in this case were abusive within the meaning of section 6700 [2] but rather claims that he cannot be found to have violated the provisions of 6700 since his involvement in the promotions did not encompass any of the specific activities proscribed by the statute. In this regard, the parties agree that the government, to be entitled to relief, must demonstrate that the plaintiff (1) organized or sold, or participated in the organization or sale of a tax shelter interest and that he (2) made or furnished a gross valuation overstatement in connection with that organization or sale.[3]

 In the years 1982 and 1983, Goals, Inc., a Mississippi corporation of which Reno was the sole shareholder and employee, contracted to act as a representative of American Education Leasing (AEL) and Americo Video Game Leasing (AVL), both divisions of H & L Schwartz, Inc., and in 1983, Reno separately contracted to serve as a representative of Educational Computer Program Leasing (ECPL). Each of these companies acquired master video and audio tapes and discs which they, in turn, leased to investors for a prepaid cash payment together with an agreement that the lessee was to pay fifty percent of distribution revenues to AVL, AEL and ECPL. The leases were treated by AVL, AEL and ECPL as purchases thus enabling the les-

---

**1.** For activity occurring on or after July 19, 1984, the penalty is $1,000 or 20 percent of gross income derived from such activity. *See* 26 U.S.C. § 6700 (Supp. III 1985).

**2.** A number of courts have in fact held that the same scheme in which plaintiff was involved was abusive. *See Gates v. United States,* 63 A.F.T.R.2d 89–1457 (8th Cir.1989); *United States v. H & L Schwartz, Inc.,* 60 A.F.T.R.2d 87–6031 (C.D.Cal.1988).

**3.** Plaintiff claims that the government, to satisfy this second prong, must prove that he furnished a "knowingly false or fraudulent statement" of gross overvaluation. However, under the statute, while one charged with making a false or fraudulent statement must know or have reason to know of its falsity or fraud, one making a gross valuation overstatement is liable regardless of any real or claimed lack of knowledge of the overvaluation. *See United States v. Music Masters,* 621 F.Supp. 1046, 1055 (W.D.N.C.1985), *aff'd,* 816 F.2d 674 (4th Cir.1987).

sees to claim investment tax credits and deduct rent and distribution expenses over the life of the lease. Goals, and hence Reno, pursuant to the agreements, was to and did receive a referral fee or commission of twenty-five to thirty-three percent of gross receipts from each sale of the master tapes by its salesmen (The salesmen received commissions of ten percent for each sale.)[4] Additionally, Reno was the regional director of AEL, AVL and ECPL and was granted the exclusive rights for business referrals in fifteen states, predominantly in the southeast, such that every time a lease of AEL, AVL or ECPL tapes was sold in those states, he received a twenty-five to thirty-three percent commission. H & L Schwartz, AEL, AVL and ECPL, as well as Goals and Reno, as representative, promoted the leasing of the master as a tax shelter. Reno recruited tax preparers and salesmen to promote the leases and supplied its salesmen and tax promoters with information and promotional material pertaining to the value of the leases and tax benefits, knowing that this material would be given by the salesmen and tax preparers to the ultimate purchasers of the leases. Moreover, Reno promoted seminars and, in some cases, spoke directly with the ultimate purchasers. He claims, nevertheless, that since he did not participate in organizing of the leasing company or in developing the leasing strategy that was determined by the IRS to be abusive, and did not participate directly in sales of the leases, he did nothing in violation of section 6700. That the H & L Schwartz organization was in place and the AEL, AVL and ECPL tax shelters were devised prior to Reno's association with the promotion does not preclude a determination of liability against Reno under section 6700, for the statute provides that one who

"organizes ... or *participates in the sale of any interest*" shall be subject to penalty. And, notwithstanding the fact that Reno, with some exceptions, did not generally make sales presentations directly to prospective lessees or provide them directly with lease information, and the fact that each sale was consummated in California between the lessor and investor/lessee (California being the state in which the lessor approved and accepted the leases), Reno unequivocally participated in the sales of leases involving EVL, AEL and ECPL. He recruited salesmen in his capacity as regional director and provided promotional and tax information to salesmen and tax preparers who, as conduits, passed that information along to lessees, and Reno profited in each instance from the sales. He cannot insulate himself from penalty merely by pointing fingers at those above and below him in the organizational structure. Such an anomaly could not have been intended by Congress in enacting section 6700. *See United States v. United Energy Corp.*, No. C–85–3655 RFP (CW), 1987 WL 4787 (N.D.Cal.1987).

█ The question becomes whether Reno furnished gross valuation overstatements as proscribed by section 6700. He had admitted that the tapes and discs had a claimed value of at least two hundred percent more than their correct value. It is, therefore, uncontested that gross valuation overstatements within the meaning of section 6700(a)(2)(B) were made. Reno asserts, though, that he made no such statements. Rather, the only appraisals containing statements as to the value of the leased masters were those sent directly from H & L Schwartz, Inc. to the lessee/investor by mail after both parties had already executed the lease agreement and

---

**4.** Reno argues that if a penalty is appropriate, it should be assessed against Goals, not him, because Goals was the representative of AVL, AEL and ECPL and because it was Goals, and not plaintiff individually, which received the commission payments and realized income from the leases. However, Reno has admitted that he is the sole shareholder, only officer and sole employee of Goals and that he controlled and continues to control each and every aspect of the corporation and its operations. Moreover, he

has admitted that he dispensed with the legal formalities required to maintain Goals as a separate corporate entity and intermingled personal and corporate expenses to a degree that eliminates the fiction of a separate corporate existence. Finally, he also has admitted that any actions taken by Goals relating to this lawsuit were actually taken by him. Under these circumstances, it is clear that if an assessment was proper, Reno was then a proper party against whom an assessment could have been made.

the lessee had paid the initial lease prepayment directly to H & L Schwartz. In fact, according to Reno, the appraisals were not sent to lessees until several weeks after the lease transactions; in the interim, the masters were recorded, then produced and appraised. Nevertheless, in the court's opinion, the fact that the appraisals were not furnished at the time of or before a prospective purchaser made the decision to invest does not prevent the assessment of a penalty under section 6700, for there is nothing in the statute to indicate such a requirement as a precondition to the imposition of the penalty, and in fact, the contrary is indicated by the legislative history. *See* S.Rep. No. 494, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Admin.News 781. That Reno was not more directly involved in the providing of the appraisals is somewhat problematic. But, Reno admitted in his testimony that a statement of the price of a particular lease would have been made at the time a purchaser decided to invest, and it has been held that a statement of price is a statement of value. *See American Technology Resources v. United States,* 709 F.Supp. 610 (E.D.Pa.1989); *United States v. United Energy Corp.,* No. C–85–3655 RFP (CW) (N.D.Cal.1987). Accordingly, the court concludes that Reno did engage in activity which makes the imposition of a penalty under section 6700 proper.

■ This conclusion brings the court to the question regarding the correct method for computation of the penalty provided by section 6700. As stated, the statute provides a penalty "equal to the greater of $1,000 or ten percent of the gross income derived or to be derived by such person from such activity." The United States contends that the proper penalty is $1,000 for each individual lease sale; hence, it has determined the penalty in this case to be $452,000, calculated on the basis of $1,000 per each of 452 leases. Reno, on the other hand, contends the correct interpretation of the statute is that an abusive tax shelter promoter shall pay either a flat penalty of $1,000 or ten percent of his or her tax shelter related income, whichever results in the greater penalty. Here, since the cumulative income he derived from the sales of all the leases in which he was involved was $600,000, he contends that the proper penalty should be $60,000 representing ten percent of that income. The appellate courts which have confronted and ruled on the issue have held that the penalty of $1,000 is a minimum penalty, not to be imposed with regard to each sale unless that amount exceeds ten percent of the gross income derived by the taxpayer against whom the assessment is made. *See Gates v. United States,* 63 A.F.T.R.2d 89–1457 (8th Cir.1989) (transactional "per sale" analysis not supported by reasoned analysis of statute or legislative history); *Bond v. United States,* 872 F.2d 898 (9th Cir.1989); *Spriggs v. United States,* 660 F.Supp. 789 (E.D.Va.1987), *aff'd,* 850 F.2d 690 (4th Cir.1988). There is a split among the district courts, however, concerning the proper interpretation of the statute, with some decisions favoring the interpretation urged by the government,[5] and others adopting the interpretation advanced by Reno.[6] This court unreservedly concludes that the proper interpretation is that advanced by Reno, for reasons well stated in *Gates, Bond* and the district court opinion in *Spriggs.* Accordingly, it is the opinion of the court that the proper penalty in this case was not $452,000, the penalty calculated by the government, but rather $86,155.20 representing ten percent of the cumulative gross income derived by Reno from sale of the leases at issue.[7]

5. *See Sisk v. United States,* No. A–86–CA–604 (E.D.Tex.1989); *Popkin v. United States,* 699 F.Supp. 893 (N.D.Ga.1988); *Johnson v. United States,* 677 F.Supp. 529 (E.D.Mich.1988); *Waltman v. United States,* 618 F.Supp. 718 (M.D.Fla. 1985).

6. *Emanuel v. United States,* 705 F.Supp. 434 (N.D.Ill.1989); *United States v. H & L Schwartz,* *Inc.,* 60 A.F.T.R.2d 87–6031 (C.D.Cal.1988); *Bowen v. United States,* 84 B.R. 214 (Bankr.D. Ut.1988); *Hersch v. United States,* 685 F.Supp. 325 (E.D.N.Y.1988).

7. The uncontradicted testimony of agent Bob Bobbitt established Reno's gross income figures as follows:

A separate judgment shall be entered in accordance with Federal Rule of Civil Procedure 58.

ORDERED.

| 1982 | | |
|---|---|---|
| AEL | $415,882.00 | |
| AVL | 40,887.00 | |
| | | $456,769.99 |

| 1983 | | |
|---|---|---|
| AEL | $ 70,989.45 | |
| AVL | 197,168.31 | |
| ECPL | 38,850.00 | |
| | | $307,007.76 |

| 1984 | | |
|---|---|---|
| AEL | $ 65,616.25 | |
| AVL | 28,648.50 | |
| ECPL | 3,510.49 | |
| | | $ 97,775.24 |
| TOTAL | $861,552.00 | |
| 10% | 86,155.20 | |